JAMES DE P. OGDEN and ALBERT W. WRIGHT, Survivors, etc., Appellants, v. D. COLDEN MURRAY, Receiver of The Accessory Transit Company, Respondent.

When an active trust for the care and management, conveyance and appropriation of personal property has been created, and the instrument creating the trust makes no provision for the compensation of the trustees, they, *prima facie*, are entitled to the same commissions as are, by statute, allowed to administrators and executors.

The above rule should, in general, be regarded as just, and, therefore, be adopted, unless there are other controlling reasons which forbid such an allowance.

But when the trustees thus appointed were of the directors of the company whose property was made the subject of the trust, and, as directors, were themselves trustees before such appointment, they come within the rule which forbids a trustee to administer the trust for his own private benefit.

It is not competent for the directors of the Accessory Transit company to create a trust in the property of the company committed to their management, and constitute a part of their number trustees of the new trust, to consider and determine its management and sale, and thereby to create a claim to compensation in their own favor for the performance of such duties.

*M. S. Bidwell*, for the appellants.

*M. Sherwood*, for the respondent.

GROVER, J. It is settled, by repeated adjudication in this State, acquiesced in for many years, although the question does not appear to have been passed upon in the court of last resort, that, where an active trust for the care, management, conveyance and appropriation of personal property has been created, and the instrument creating the trust makes no provision for the compensation of the trustees, they are *prima facie* entitled to the same commissions as are, by statute, allowed to guardians, executors and administrators.

The terms of the instrument may be such as to negative the idea that any compensation to the trustees was contemplated, the relationship of the parties or other extrinsic facts may clearly indicate that the labor and responsibility of the trust were voluntarily assumed, and were intended by all parties to be gratuitously performed. (*Mason* v. *Roosevelt*, 5 Johns. Ch. 534; *Mumford* v. *Murray*, 6 id. 452.)

The subject is discussed by Chancellor WALWORTH, in *Meacham* v. *Sternes et al.* (9 Paige, 398). The doctrine of that case is strongly re-asserted in *The Matter of De Peyster* (4 Sandf. Ch. 511) by Vice-Chancellor SANDFORD, and held not to require, that the property held should be converted by the trustee into money; that, though delivered in specie, and in the very form in which it came to his hands, commissions should be allowed thereon. And the Supreme Court, in *Wagstaff* v. *Lowerre* (23 Barb. 209), held the same rule, in favor of a trustee appointed by will. That the English rule and the law of this State was otherwise, prior to the statute of 1818, fixing the compensation of executors and administrators, appears in these cases, and in *Manning* v. *Manning* (1 Johns. Ch. 534). (See 2 Story's Eq. Jur. § 1268 and notes; *Robinson* v. *Pitt*, White & Tudor's Lead. Cas. in Eq. Am. Notes, 70 ; Law Lib. p. 353 *et seq.*)

Without affirming that the rule is so unqualified, that the rate of compensation allowed by statute to executors, administrators and guardians must, in all cases where compensation is allowed to trustees, be the exact measure, without any consideration of the nature and extent of the duties and responsibilities imposed by the trust, or that in no case the court will inquire what less amount would be a reasonable compensation, I think the rule above stated should, in general, be regarded as reasonable and just, and, therefore, to be adopted, unless there are controlling considerations which forbid the allowance.

There is nothing, in the language of the instruments by which the trust in this case was created and declared, indicating any agreement on the subject of commissions, nor manifesting any intent that the service with its responsibilities should be assumed or borne gratuitously.

The property in question consisted of seven steamships, transferred to the appellants and their associate, Snow (now deceased), to hold for the use and benefit of the Accessory Transit company, and in trust and confidence that the trustees will account for and pay over to the company, or to whomsoever the company may appoint, all earnings, receipts

and profits from or on account thereof, or of any or either of them, which they may receive, and any and all insurance moneys which may be received, on account of the ships, or either of them; and will assign, transfer and convey the said ships, and any of them, on request of the company, to the said company or such appointee.

It is true, that the trustees permitted the ships to be employed and run by other agents of the company, and the company received the earnings directly. But, although this may be a reason for denying to them commissions on such receipts and earnings, it would not deprive them of their just claim to compensation for the discharge of the trust, in holding the property subject to a liability to account therefor, and to convey the same, and a further responsibility to third parties, who would have a right to look to the legal title to the ships, and charge the trustees as such.

I think, therefore, that there is nothing in the nature and terms of the trust which precludes the allowance of commissions to the trustees under the general rule above stated.

But the trustees were themselves directors of the company, and, as such, were already trustees, bound to manage the affairs and property of the company for the interest of its stockholders, and, by familiar and well-settled principles of law, as well as the most obvious rules of justice, forbidden to administer its affairs for their private emolument.

There were seven directors. The creation of the trust and the designation of the trustees was authorized by a resolution, passed at a meeting of the directors, at which they were present and voted; and, although they did not constitute a majority, their voice and influence was cast in favor of the arrangement by which property, to the amount of one million three hundred and fifty thousand dollars, purchased and paid for by the company, was placed in their hands. *Prima facie*, this act was, itself, a breach of trust. The directors had *prima facie* no right to place the property in the hands of third persons, and thus put the title beyond the proper control of the board of directors, who were, by law, trustees for the control, employment and man-

agement of the property of the company, for the benefit of
its stockholders.    True, they declared a trust to hold for the
use of the company, but it is no part of the proper duty and
power of the directors of the company to divest the com-
pany itself of the title to its property, and subject it to the
hazard of the fidelity of trustees, or make the actual benefits
to be derived by the stockholders depend upon the efficiency
of proceedings in court to compel the performance of such a
trust.

It is, however, not necessary to say that there may not be cir-
cumstances in the condition of an incorporated company,
which will warrant the transfer of its property, or portions
of it, to trustees, for purposes which are lawful and consis-
tent with the duty owed to the company.    I do say, however,
that the creation of such a trust requires some legal and
sufficient purpose to excuse it.

I find no facts stated in the case agreed upon here, as the
reasons for creating the trust in question.    The company
was incorporated by the "State or Republic of Nicaragua."
Its "corporate object and business was the transportation of
passengers and freight from the city of New York to certain
ports on the Pacific, and it was necessary, in order to carry
out the objects of its incorporation, that the said company
should own or have the control of several steamships run-
ning on either side of the Isthmus of Nicaragua."

Nothing in the case agreed upon indicates, that the com-
pany could not own, hold and run steamships agreed to be
" *necessary to carry out the object of its corporation,*" to wit,
" the transportation of passengers and freight."

What was, then, the impediment?    It is suggested, in
argument, that the laws of the United States prevented the
company, a foreign corporation, from taking and holding the
title to these ships.    The case states, that, in July, 1854, an
act of congress was passed authorizing this company to hold
steamships in their own name.

And the argument is therefore this:  At the time this
trust was created, the company could not, by law, take the
legal title to itself.    The conveyance to the trustees was

therefore necessary; and, if necessary, then, as between the trustees and the company, was proper, in order to carry out the objects of the incorporation, and secure to the stockholders the means of carrying on the business for which it was created, and the profits and emoluments derivable therefrom.

It is, doubtless, true, that a foreign corporation cannot take title to a vessel, and retain her registration as a vessel of the United States, entitled to the privileges and protection of a national as distinguished from a foreign ship. But I find no warrant for saying, that the Accessory Transit company had not legal capacity to take the title to these steamships, and hold and employ them for all purposes for which citizens of Nicaragua may hold and employ vessels, and, among other purposes, the running them between their own ports, and the ports of the United States, subject to all the disadvantages, of course, of being treated as foreign vessels, and restricted in their trade by all the disabilities to which foreign ships are subject. The objects of their incorporation declared in their charter import the power to hold and employ such ships.

The question thereupon arises, may a foreign corporation, in order to obtain and keep all the advantages derivable from a trade which can only be advantageously carried on in American vessels, registered as such, under a system which makes a fraudulent registry a forfeiture of the ship, and which requires the oath, that no foreigner has any interest in the ship,— purchase and employ ships for the sole use and benefit of the corporation, and with expressed authority to direct and control their use and disposition, and cover the ownership under a trust in American citizens, they taking the title for that purpose.

I cannot resist the conclusion, that this is not only an evasion, but a fraud upon the laws of the United States, which ought not to be sustained or sanctioned, directly or indirectly, and that no court should hold, that a trust for such a purpose should be upheld either to give compensation to the trustees or for any other object.

If there was any other purpose, or any other ground upon which the propriety of the trust may be vindicated (and, for the purposes of this case, it is not necessary to say that there may not have been), it is at least true, that there was legal capacity in the company to take the steamships; and the expediency and propriety of doing so was a proper subject of consideration by the board of directors. Whether it was for the interest of the stockholders to pay the purchase price, and leave the title in third persons, subject to a charge by way of compensation therefor, and subject to any of the hazards consequent thereupon, was a subject of grave consideration, in reference to which, the directors, as trustees, were not at liberty to act under the influence of self-interest.

In this aspect of their relation to the subject, the appellants and their associates were not in a situation permitting them to secure to themselves a personal advantage in the matter. The stockholders and creditors were entitled, not only to their vote in the board, but to their influence and argument in the discussion which led to the passage of the resolution, in pursuance of which they took title as trustees.

This brings the case within the rule, which rests in the soundest wisdom, and is sustained by the best consideration of the infirmities of our human nature, and called for by the only safe protection of the interests of *cestuis que trust*, or beneficiaries, viz. :

That trustees, and persons standing in similar fiduciary relations, shall not be permitted to exercise their powers, and manage or appropriate the property of which they have control, for their own profit or emolument, or, as it has been expressed, " shall not take advantage of their situation to obtain any personal benefit to themselves at the expense of their *cestuis que trust.*" (Story's Eq. Jur. § 466 *a ;* Hill on Trustees, 535.)

This by no means assumes, that the trustees were not, in this case, in the actual exercise of the highest integrity. I cannot for a moment doubt that, in reference to the particular

case before us; but the principle is one of great importance, and it forbids any inquiry into the honesty of a particular case. If it would have been competent to select their trustees disconnected from the company, still it was not competent for the directors themselves to create a trust of this description, consider and determine its expediency, and thereby create a claim to compensation in their own favor for the performance of its duties.

For these reasons, I think the judgment should be affirmed.

CLERKE, J. The defendant is the receiver of the Accessory Transit company, now insolvent. It was a corporation created by the republic of Nicaragua; and it carried on business in the city of New York. A purchase was made, on its behalf, in December, 1852, of seven steamships from Mr. Cornelius Vanderbilt, for the purpose of running them on their line between New York and San Francisco, via Nicaragua. Being a foreign corporation, the company could not then take the title, and have the ships registered in its own name; and, on the 30th of December, 1852, the board of directors, seven in number, passed a resolution, that the vice-president of the company and two of the directors be appointed trustees to receive a transfer of the ships, and hold them subject to the control and disposition of the company. These were the two plaintiffs, Mr. Ogden, the vice-president, and Mr. Wright; and the third was Mr. Snow, since deceased. Mr. Ogden received, as vice-president, a salary of $4,000 a year. They were all present at the meeting, and voted for the resolution. They received bills of sale of the ships in their names, and signed an instrument declaring that they had received the bills of sale, and held the ships for the company. On the 27th of July, 1854, the company indemnified each of the trustees by a bond in a penalty of $100,000, against any claims and demands on account of the ships; soon after, an act of congress was passed, authorizing the company to hold steamships in its own name; and thereupon Messrs. Ogden, Wright and Snow transferred the title in

them to the company by bills of sale; after this transfer, they addressed a letter to the president and directors, claiming compensation as trustees; which the company refused to pay. In 1858, the company became insolvent; and, soon afterward, the defendant was appointed receiver.

After the transfer to the trustees, they had no more to do with the control and management of the ships, than any other members of the board; and the ships were actually run, under the supervision of the whole board, by Mr. Vanderbilt, as the agent of the company.

The plaintiffs now claim, by way of compensation, the same commissions as are allowed to executors and administrators. They claim $3,950, being the amount of commission upon the sum of $1,350,000, the amount paid by the company to Vanderbilt, as the purchase-money; they also claim interest on this sum of $3,950, from the 27th of January, 1854, making in the whole $7,900.

It does not appear, that the purchase-money, or any portion of it, passed through the hands of the trustees, or that they performed any services, or incurred any risks or responsibilities, beyond taking the bills of sale in their names, and holding them, and executing bills of sale to the company. So that, no active duties devolved upon them; and, for any responsibilities which they incurred, they were fully indemnified by having the legal title to the ships, and by the bond of indemnity which they subsequently received. They did not, like executors, administrators, guardians and other trustees, become the custodians of the funds of the company, receiving its earnings, or paying them out. They demand this sum of $3,950, merely for allowing their names to be inserted in the bills of sale. In my opinion, they are not entitled to compensation on any equitable grounds. In all probability, at the time of the passage of the resolution appointing them trustees, neither they, nor any other member of the board, had any idea, that compensation would be required, or was necessary. Not a word was said on the subject at the time the resolution was passed, nor was any intimation given by them of a claim for services at any time,

until they presented their demand, more than two years and six months afterward; when they had transferred the ships to the company.

The judgment should be affirmed, with costs.

All concur, except HUNT, Ch. J., and DWIGHT, J.

Judgment affirmed.